# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

OTIS FISHER,               )
                           )
    Plaintiff,         )
                           )
v.                         )  Civil Action No. 3:10CV486–HEH
                           )
CAROLYN NEALE, *et al.*,    )
                           )
    Defendants.        )

## <u>MEMORANDUM OPINION</u>
**(Granting Defendants' Motion for Summary Judgment; Dismissing Claim Against Defendant Hickey Pursuant to Rule 41(a)(2))**

This is a civil rights action against various employees of the Northern Neck Regional Jail ("NNRJ"). It is presently before the Court on Defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Defendants assert that they are entitled to qualified immunity. In the alternative, Defendants contend that Plaintiff failed to exhaust his administrative remedies in accordance with the Prisoner Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e. The facts and legal contentions are adequately presented in the materials before the Court, and oral argument would not aid the decisional process. For the reasons stated below, Defendants' Motion will be granted.

## I. BACKGROUND

On or about July 22, 2007, while Plaintiff was fleeing police in his motor vehicle, Plaintiff's vehicle skidded off an embankment, flipped, and landed on its roof. Plaintiff was transported to Riverside Tappahannock Hospital, then to the Medical College of

Virginia Hospital ("MCV"). MCV physicians diagnosed him with a displaced fracture through the left lamina of the C-7 of his cervical spine—*i.e.*, a broken neck—and noted that he had some swelling in his left wrist.[1]

After approximately three days at MCV, Plaintiff was discharged as "safe to return home" by MCV's physical and occupational therapists. (Pl.'s Br. Resp. Ex. 3, at NNRJ393.) He was prescribed medication, instructed to wear an Aspen collar 24 hours per day to completely immobilize his neck, and instructed to make a follow-up appointment with "the Neurosurgery Clinic . . . in approximately 3 weeks from the time of discharge." (*Id.*; *see also id.* at NNRJ450.) Plaintiff was discharged from MCV, arrested on a warrant, and transported to the Richmond City Jail. On or about July 26, 2007, Plaintiff was transferred to NNRJ.

At NNRJ, Defendant Carolyn Neale ("Nurse Neale"), a Registered Nurse with over 30 years of experience, performed a medical assessment of Plaintiff. Plaintiff was instructed to wear his Aspen collar 24 hours per day, as directed by MCV.

On or about August 3, 2007, Plaintiff appeared before the Richmond County General District Court. Defendant William Hickey ("Captain Hickey"), an NNRJ supervisor in charge of training, transportation, and intake, received a call during the hearing that Plaintiff had fallen to the ground and possibly passed out. Captain Hickey

---

[1] It is not clear from the record whether Plaintiff sustained his wrist injuries at the same time he injured his neck. (*Compare* Mem. L. Supp. Defs.' Mot. Summ. J. [hereinafter Defs.' Mem. L.] Ex. 4 [hereinafter Neale Dep.] 9: 19–22 (noting that Plaintiff fractured his wrist in 1997); *id.* at 24: 15–18 (noting that Nurse Neale did not know when Plaintiff's wrist was injured, but she first became aware of it in October of 2007), *with* Pl.'s Br. Resp. Ex. 3, at NNRJ393 (noting that prior to discharge from MCV, Plaintiff complained of hand pain and swelling in his left wrist).) In any event, it is undisputed that Plaintiff presented some swelling in his wrist at the time of his discharge from MCV in July 2007. (*See* Pl.'s Br. Resp. Ex. 3, at NNRJ393.)

and Nurse Neale responded to the courthouse. Nurse Neale examined Plaintiff on arrival, and found him to be alert, oriented, and awake, with no symptoms requiring urgent or emergency care. Although there is no support in the record, Plaintiff contends that a judge ordered that he be taken to a hospital. Nurse Neale and Captain Hickey deny hearing such an order. Plaintiff was transported back to NNRJ.

On August 8, 2007, Plaintiff was again treated at MCV for his spinal injuries. That same day, he was transferred from NNRJ's Medical Unit to Special J, a minimum security, dormitory-style unit used for medical segregation. While in Special J, Plaintiff had access to the commissary, and, although Plaintiff did not have a phone in his individual cell, he retained phone privileges outside his cell.[2] Initially, Plaintiff's cell did not contain a television, but NNRJ provided him a television for the second of his two months in Special J. Plaintiff remained in medical segregation until October 2, 2007.

Surgery for Plaintiff's neck was originally scheduled for September 11, 2007, but MCV cancelled the surgery on September 10, 2007. Plaintiff was returned to MCV on September 21, 2007. Doctors' notes from that appointment state that Plaintiff had initially been considered for surgery, but MCV "decided to repeat his C-spine CT scan to evaluate the state of bony fusion of the fracture fragments." (Defs.' Reply Pl.'s Opp'n [hereinafter Defs.' Reply] Ex. 10, at NNRJ353.) NNRJ returned Plaintiff to MCV for

---

[2] According to Plaintiff, he was let out for phone calls "[e]very once in a while." (Defs.' Mem. L. Ex. 1 [hereinafter Fisher Dep.] at 62:24–25.)

additional appointments on October 3, 2007; December 5, 2007; and March 5, 2008 to address his spinal injury.[3]

In addition, Plaintiff attended several medical appointments concerning his wrist. Dr. Reese, the physician at NNRJ, evaluated Plaintiff on October 23, 2007, and January 29, 2008. Plaintiff received an MRI on his wrist at MCV on February 8, 2008. Plaintiff's wrist was examined again by an NNRJ nurse on February 18, 2008, and a follow-up appointment at MCV was set for April 2, 2008. The April 2 appointment was pushed back to April 16, 2008 to accommodate Plaintiff's court appearance. Plaintiff underwent surgery for his wrist on May 16, 2008. He was scheduled for a post-operation follow-up visit at MCV on May 21, 2008, which MCV rescheduled for May 28, 2008.

During this time—beginning on October 22, 2007 and continuing through November 2008—Plaintiff submitted over thirty "Inmate Request Forms" to various persons and departments at NNRJ, which stated that he was in pain and needed medical

---

[3] In their memorandum in support of summary judgment, Defendants asserted that Plaintiff was seen at the Department of Neurosurgery at MCV on August 8, 2007; September 21, 2007; September 27, 2007; October 3, 2007; December 5, 2007; and March 5, 2008. (Mem. L. Supp. Defs.' Mot. Summ. J. [hereinafter Defs.' Mem. L.] 3 ¶ 8.) Plaintiff did not deny receiving treatment on those dates, but objected that Defendants failed to cite any part of the record in support of that assertion. (Pl.'s Br. Resp. 1.) In reply, Defendants attached MCV's Ambulatory Care Clinic Records, which were retained in Plaintiff's file at NNRJ. (*See* Defs.' Reply Exs. 10, 11.) The records corroborate Defendants' assertion as to treatment dates, with the exceptions that (1) it is unclear whether Plaintiff received treatment at MCV on September 27, 2007; and (2) although somewhat unclear, the records appear to indicate a visit on August 3, 2007. (*Id.*) The medical reports from MCV which were attached to Plaintiff's Brief in Response to Defendants' Motion for Summary Judgment further corroborate Plaintiff's July 22, 2007; October 3, 2007; December 5, 2007; and October 22, 2008, visits to MCV. The Court considers only those visits to MCV which are fully corroborated by the Ambulatory Care Clinic Records.

4

treatment for his neck and wrist.[4] Plaintiff also filed one grievance concerning his medical care in November 2007.[5]

## II. PROCEDURAL HISTORY

On July 12, 2010, Plaintiff filed a Complaint in the Circuit Court for the City of Richmond, alleging violations of his First and Eighth Amendment rights, enforceable under 42 U.S.C. § 1983. Plaintiff alleged that the Defendants violated his Eighth Amendment rights by showing deliberate indifference toward his neck and wrist injuries. He claims that his neck went untreated for over a year and, as a result, he can no longer undergo corrective surgery. Additionally, Plaintiff alleged that Defendants Lynn Sudduth ("Captain Sudduth"), supervisor of the Medical Department, and Ted Hull ("Major Hull"),[6] who was then a Major and Assistant Superintendent of NNRJ,[7] violated his First Amendment rights by placing him in Special J in retaliation for communicating with family and making repeated requests for medical treatment.

Defendants removed the state-court action to this Court on July 15, 2010. On July 29, 2010, Defendants moved to dismiss on the grounds of qualified immunity and, in the alternative, failure to state a claim. By Memorandum Opinion and Order dated

---

[4] In addition, Plaintiff submitted six inmate request forms in February 2008 complaining of pain in his ankle, as well as a February 24, 2008 request complaining of "severe pains in [his] groin area and . . . lower stomach." (*See* Pl.'s Br. Resp. Ex. 2, at XF-000038.) Plaintiff's Eighth Amendment claims, however, relate only to his neck and wrist. Plaintiff's requests as they relate to each of the named Defendants are detailed in Part IV.A., *infra*.

[5] It is not clear from the record whether Plaintiff received a response to his grievance. There is no dispute, however, that Plaintiff did not appeal NNRJ's response (or lack thereof) within the jail's grievance system.

[6] Major Hull was improperly sued as "Major Ted Hall." Plaintiff has not amended his Complaint to reflect the proper spelling of Major Hull's name.

[7] Major Hull is currently employed as the Superintendent of NNRJ. (Defs.' Mem. L. Ex. 6 [hereinafter Hull Decl.] ¶ 2.)

September 8, 2010, this Court granted in part and denied in part the motion. Specifically, the Court dismissed Plaintiff's Eighth Amendment claims against Captain Sudduth and Superintendent Jeffrey Frazier pursuant to Rule 12(b)(6), but denied Defendants' motion with respect to Plaintiff's remaining First and Eighth Amendment claims. The Court declined to rule on Defendants' then-cursory assertion of qualified immunity, but noted that Defendants could renew their claim of qualified immunity following discovery if appropriate facts developed. (Sept. 8, 2010 Mem. Op. 7 n.6.)

Defendants filed the instant Motion for Summary Judgment on February 4, 2011, contending that they are entitled to qualified immunity as a matter of law. In the alternative, Defendants assert that Plaintiff failed to exhaust his administrative remedies in accordance with the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. 1997e(a). Plaintiff has responded and Defendants have replied. The matter is ripe for decision.[8]

### III. STANDARD OF REVIEW

Summary judgment is proper where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if the evidence, when viewed "in the light most favorable to the non-moving party," *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990), "is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).

---

[8] Plaintiff concedes that he cannot establish a claim of deliberate indifference as to Captain Hickey. (Pl.'s Br. Resp. 10 n.1.) Per Plaintiff's request, his claim against Captain Hickey will be dismissed pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure.

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion" and "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986). Once the movant meets this initial burden, however, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (emphasis in original) (quoting Fed. R. Civ. P. 56(e)). "[A] complete failure of proof concerning an essential element of the [plaintiff's] case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2552. "A mere scintilla of evidence supporting his case is insufficient." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (citing *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510). Where the record taken as a whole cannot lead a rational trier of fact to find for the nonmoving party, no genuine issue exists for trial and summary judgment is appropriate. *Matushita*, 475 U.S. at 587, 106 S. Ct. at 1356.

## IV. ANALYSIS

The doctrine of qualified immunity shields government officials exercising discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). Because "[q]ualified immunity is an entitlement not to stand trial or face the other burdens of litigation," questions of immunity should be resolved "at the earliest

possible stage in litigation." *Saucier v. Katz*, 533 U.S. 194, 200–01, 121 S. Ct. 2151, 2156 (2001) (internal quotations omitted).

Whether an official is entitled to qualified immunity depends on two factors: (1) whether the facts, viewed in the light most favorable to the plaintiff, show that the officer's conduct violated a constitutional right; and (2) whether that constitutional right was "clearly established" at the time of the violation.[9] *Id.* at 201, 121 S. Ct. at 2156. District courts may "exercise their sound discretion in deciding which of the two prongs . . . should be addressed first in light of the circumstances of the particular case at hand."[10] *Pearson v. Callahan*, 555 U.S. 223, ____, 129 S. Ct. 808, 818 (2009). In this case, the appropriate starting point is to determine whether Defendants violated Plaintiff's constitutional rights.

## A. *Plaintiff's Eighth Amendment Claims*

A prison official's deliberate indifference toward an inmate's serious medical needs is actionable under the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 290 (1976). A prisoner asserting a violation of his Eighth Amendment rights on this ground must establish two elements: First, he must show that he was deprived of medical care in an "objectively, 'sufficiently serious'" way. *Farmer v. Brennan*, 511 U.S. 828, 834, 114 S. Ct. 1970, 1977 (1994) (quoting *Wilson v. Seiter*,

---

[9] A right is "'clearly established' if '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Owens v. Lott*, 372 F.3d 267, 279 (4th Cir. 2004) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987)).

[10] Until 2009, district courts were required to analyze the factors sequentially. *Pearson v. Callahan*, 555 U.S. 223, ____, 129 S. Ct. 808, 818 (2009) (making discretionary the mandatory two-step approach set forth in *Saucier v. Katz*, 533 U.S. 194, 200–01, 121 S. Ct. 2151, 2156 (2001)).

501 U.S. 294, 298, 111 S. Ct. 2321, 2324 (1991)). Second, he must allege that the prison

official possessed "a sufficiently culpable state of mind." *Id.* (internal quotation omitted).

Defendants do not dispute that Plaintiff has alleged a serious medical condition

sufficient to satisfy the first element.[11] (*See* Mem. L. Supp. Defs.' Mot. Summ. J.

[hereinafter Defs.' Mem. L.] 14–22.) Defendants' assertion of qualified immunity

therefore turns on the second, subjective element.

The Fourth Circuit has identified two aspects of a prison official's state of mind

that must be shown in order to satisfy the subjective element of "deliberate indifference."

*Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). First, the officer must have had actual

knowledge of the risk of harm. *Id.* Second, "the officer must *also* have 'recognized that

*his actions were insufficient*' to mitigate the risk of harm to the inmate arising from his

medical needs." *Id.* (emphasis in original) (quoting *Parrish ex rel. Lee v. Cleveland*, 372

F.3d 294, 303 (4th Cir. 2004)). In other words, "[d]eliberate indifference may be

demonstrated by actual intent or reckless disregard." *Miltier v. Beorn*, 896 F.2d 848, 852

(4th Cir. 1990). A defendant acts recklessly by disregarding a substantial risk of danger

that is known to the defendant.[12] *Id.*

---

[11] The Fourth Circuit in *Loe v. Armistead* recognized a broken arm as a sufficiently serious condition. 582 F.2d 1291, 1296 (4th Cir. 1978). Plaintiff's spinal injury appears to be at least as serious. The parties have not specifically addressed the severity of Plaintiff's wrist injury, but it is undisputed that Plaintiff ultimately underwent surgery for his wrist. Because Defendants have not contested the severity of Plaintiff's wrist injury, this Court assumes for the purposes of this motion that Plaintiff can satisfy the objective element of his deliberate indifference claim concerning his wrist.

[12] The Fourth Circuit in *Miltier* defined recklessness in terms of what a defendant actually knew "or which would be apparent to a reasonable person in the defendant's position." *Miltier*, 896 F.2d at 851–52. As Judge Payne noted in *Brown v. Mitchell*, however, "*Farmer* [*v. Brennan*, 511 U.S. 828, 114 S. Ct. 1970 (1994)] overruled cases, such as *Miltier*, to the extent that they

Because Plaintiff's claims against Nurse Neale, a healthcare provider, are subject to a different standard than his claims against non-medical supervisors Captain Turner and Major Hull, *see id.*, the Court addresses Plaintiff's claims as to each Defendant in turn.

### 1. Nurse Neale

In order to establish deliberate indifference on the part of a healthcare provider, the plaintiff must show that the treatment was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier*, 896 F.2d at 851. "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999); *see also Miltier*, 896 F.2d at 852 ("[M]ere negligence or malpractice does not violate the eighth amendment.").

Plaintiff's claims fall woefully short of establishing deliberate indifference on the part of Nurse Neale. First, as to Plaintiff's spinal injury, Nurse Neale assessed Plaintiff upon his arrival at NNRJ in late July 2007. (Defs.' Mem. L. Ex. 2 [hereinafter Neale Decl.] ¶ 4.) In accordance with MCV's discharge summary, she instructed him to wear his Aspen collar 24 hours per day.[13] (*Id.*) Following that assessment, Plaintiff was

---

allowed a finding of deliberate indifference upon constructive knowledge." 308 F. Supp. 2d 682, 708 n.30 (E.D. Va. 2004). Of course, however, a prison official cannot remain willfully blind to a substantial risk of danger. *See Farmer*, 511 U.S. at 842–43, 114 S. Ct. at 1981–82.

[13] Interestingly, an August 1, 2008 Nurse's Note reports that Plaintiff was observed "resting quietly with neck brace removed" in his cell in Medical, in contravention to the instructions of his MCV physicians and the NNRJ medical staff. (Defs.' Mem. L. Ex. 2, at NNRJ278.) Additionally, several Nurse's Notes remark that Plaintiff refused weekly assessments while in Special J. (*See, e.g.*, Pl.'s Br. Resp. Ex. 3, at NNRJ273.) Because Plaintiff denies ever refusing

10

housed in the Medical Unit of NNRJ. (*See* Defs.' Mem. L. Ex. 5 [hereinafter Sudduth Decl.] ¶ 10.)

When Plaintiff "collapsed" in court on August 3, 2007, Nurse Neale responded to the scene, took his vital signs, and performed other diagnostic tests. (Neale Decl. ¶¶ 18–19.) She found him to be alert, oriented, and awake, with no symptoms requiring urgent or emergency care. (*Id.*) Because Plaintiff complained of pain and burning in his neck and spine area, the Court will assume that the incident placed Nurse Neale on further notice of Plaintiff's spinal injury.[14] Within days, Dr. Reese at NNRJ requested an MRI of Plaintiff's chest and neck, which Captain Sudduth and Major Hull approved. (Pl.'s Br. Resp. Ex. 3, at NNRJ526.) On August 8, 2007, Plaintiff was transported to MCV. (*See* Defs.' Reply Ex. 3, at NNRJ414.) Upon his return to NNRJ, he was transferred to Special J, the medical segregation unit. (*See* Pl.'s Br. Resp. Ex. 6 [hereinafter Hull Dep.] 47:9.) These facts reveal nothing but prompt medical attention on the part of Nurse Neale.

Plaintiff nevertheless attempts to hold Nurse Neale accountable for what he characterizes as inadequate treatment for his neck based on an onslaught of inmate requests that he submitted to "Medical." Although none of Plaintiff's requests were specifically directed to Nurse Neale, Defendants do not appear to dispute that Nurse

treatment, however, the Court will not assume that Plaintiff did so, despite the record evidence to the contrary.

[14] The Court will not, however, infer that the incident put Nurse Neale on notice of Plaintiff's wrist injury. It is undisputed that Nurse Neale first became aware of his wrist injury in October 2007. (*See* Neale Dep. 25:7.)

Neale was aware of the requests. The Court will therefore assume that Nurse Neale was mindful of Plaintiff's requests to Medical and the responses thereto.

Plaintiff was seen at least four times at MCV before he began submitting inmate requests concerning his neck. Specifically, he was seen on July 22, 2007; August 8, 2007; September 21, 2007; and October 3, 2007. (*See* Pl.'s Br. Resp. Ex. 3, at NNRJ392; Defs.' Reply Ex. 10, at NNRJ421, NNRJ414, NNRJ 422, NNRJ353, NNRJ407.)

It is undisputed that MCV—not Nurse Neale or anyone else at NNRJ—cancelled Plaintiff's neck surgery, which was originally set for September 11, 2007. (Pl.'s Br. Resp. Ex. 3, at NNRJ273.) Doctor's notes from Plaintiff's September 21, 2007 MCV appointment state that Plaintiff had initially been considered for surgery, but MCV "decided to repeat his C-spine CT scan to evaluate the state of bony fusion of the fracture fragments." (Defs.' Reply Ex. 10, at NNRJ353.) NNRJ returned Plaintiff to MCV on October 3, 2007, at which time Planitiff's treating physician examined him and took another CT scan of Plaintiff's neck. (*Id.* at NNRJ407.)

Plaintiff submitted his first neck-related inmate request on November 25, 2007. (Pl.'s Br. Resp. Ex. 2, at XF-000006.) Specifically, he stated that his "neck hurt when I turn its [sic] like needles." (*Id.*) NNRJ returned Plaintiff to MCV less than two weeks later, on December 5, 2007. (Pl.'s Br. Resp. Ex. 3, at NNRJ286.) During that visit, MCV physicians performed a CT scan on Plaintiff's neck, which revealed partial healing of Plaintiff's right C7 pedicle fracture. (*Id.*)

On December 19, 2007, Plaintiff complained to the Medical sector at NNRJ ("Medical") that he had not been able to schedule therapy for his neck because he had not

seen Dr. Reese.[15] Within two days, Ms. Woolard responded, "We are waiting to receive

an appointment date from MCV." (Pl.'s Br. Resp. Ex. 2, at XF-000008.) Plaintiff sent

additional requests to Medical on January 9, 18, and 28, reminding the staff that he was

still waiting for Medical to schedule therapy for his neck. (*Id.* at XF-000009, XF-

000013, XF-000024.) A January 28, 2008 response said, "Refer to Doctor on next visit."

(*Id.* at XF-000024.) A separate response in early February indicated that Nurse Neale

would request that Plaintiff be brought to Medical for re-evaluation. (*Id.* at XF-000031.)

On March 5, 2008, NNRJ returned Plaintiff to MCV for an eighth appointment

concerning his neck. (*See* Defs.' Reply Ex. 10, at NNRJ329). At that appointment, the

examining physician noted that the "surgical risk outweigh[ed] [the] clinical picture"

concerning Plaintiff's spinal injury, and MCV would plan on "cont[inue]d conservative

management." (*Id.*) Plaintiff was instructed to follow-up in six months (*id.*), and was

accordingly returned to MCV on September 30, 2008 (*id.* at NNRJ303).

This litany of events provides no support for the contention that Nurse Neale

behaved in a manner "so grossly incompetent, inadequate, or excessive as to shock the

conscience or to be intolerable to fundamental fairness" with respect to Plaintiff's neck

injury. *Miltier*, 896 F.2d at 851. To the contrary, the record suggests that she and the rest

of the Medical staff promptly responded to Plaintiff's requests and diligently worked to

schedule the necessary appointments at MCV. The sheer number of times Plaintiff was

referred and transported to MCV for treatment belies Plaintiff's claim of deliberate

---

[15] Noticeably absent from the record is any order or recommendation for therapy from Plaintiff's treating physicians at MCV.

indifference. *Cf. Henderson v. Kessler*, Nos. 93-6222, 93-6223, 1994 U.S. App. LEXIS 15156, at *5 (4th Cir. June 20, 1994) (affirming summary judgment for jail's attending physician where record was replete with documentation of medical care and supervision provided to inmate, "including frequent referral to MCV").

Furthermore, the record is clear that MCV—not Nurse Neale or her staff—decided to forego surgery on Plaintiff's neck. (*See, e.g.*, Pl.'s Br. Resp. Ex. 3, at NNRJ273, NNRJ329; Defs.' Reply Ex. 10, at NNRJ353.) NNRJ cannot be held accountable for MCV's chosen course of treatment. Moreover, MCV's October 22, 2008 "Final Report" indicates that his "fractures have all healed completely,"[16] (Pl.'s Br. Resp. Ex. 3, at NNRJ294), and no physician to date has told Plaintiff that his injuries are permanent (Fisher Dep. 154:19–24).[17]

Plaintiff's claim of deliberate indifference concerning his wrist injury similarly fails. On October 22, 2007, Plaintiff directed a request to Medical to see a doctor for numbness in his left arm and pain in his left wrist. (Pl.'s Br. Resp. Ex. 2, at XF-000003.) Dr. Reese of NNRJ saw him the following day. (Neale Dep. 24:24–25:7; *see also* Pl.'s

---

[16] Plaintiff seizes on a portion of the report which states, "The facet structure on the left at C7 has healed with facets in a locked position." (*See* Pl.'s Br. Resp. 13.) He characterizes the "locked position" as a "painful position" which was "not diagnosed until approximately fifteen months after he arrived at NNRJ." (*Id.*) However, Plaintiff has provided no support for his inadmissible, self-diagnostic opinion that his neck has healed improperly. Even assuming that Plaintiff's neck has healed improperly, Plaintiff has not provided any evidence from which a reasonable juror could attribute the improper healing to Nurse Neale. Quite the opposite, the record indicates that Nurse Neale followed the instructions of his treating physicians at MCV.

[17] Plaintiff does note that he has been unable to receive proper medical care since his release from NNRJ, because he has no health insurance and lacks the funds to pay for medical care. (Pl.'s Br. Resp. 3.) Nevertheless, it is undisputed that Plaintiff's treating physicians at MCV have never advised that his injuries are permanent. (Fisher Dep. 154:19–24.)

Br. Resp. Ex. 2, at XF-000003.) Nurse Neale first became aware of his continued wrist injury around this time. (*See* Neale Dep. 25:5–7.)

On November 25, 2007, Plaintiff complained to Medical that he had not yet received an MRI on his wrist as suggested by Dr. Reese. (Pl.'s Br. Resp. Ex. 2, at XF-000006.) Medical Assistant Heather Woolard responded two days later that they were working on getting him an appointment at MCV. (*Id.*) Plaintiff was indeed seen at MCV on December 5, 2007—less than two weeks after Plaintiff's request. (Defs.' Reply Ex. 10, at NNRJ388.)[18]

On December 19, 2007, Plaintiff again complained to Medical that he had not yet received an MRI on his wrist. (Pl.'s Br. Resp. Ex. 2, at XF-000008.) Within two days, Ms. Woolard responded, "We are waiting to receive an appointment date from MCV." (*Id.*) Plaintiff sent additional requests to Medical on January 9, 18, and 28, reminding the staff that he was still waiting for Medical to schedule an MRI for his wrist. (*Id.* at XF-000008, XF-000013, XF-000024.) A January 28, 2008 response said, "Refer to Doctor on next visit." (*Id.*) NNRJ records indicate that Plaintiff was seen by Dr. Reese for his wrist the next day. (*See id.* at XF-000031.)

Plaintiff received an MRI on his wrist on February 8, 2008, just over a week after his appointment with Dr. Reese. (*Id.*) NNRJ's Nurse Veney saw Plaintiff on February 18, 2008 (*id.*), and an appointment for Plaintiff's wrist was scheduled at MCV for April 2, 2008 (*see* Pl.'s Br. Resp. Ex. 3, at NNRJ372). In order to accommodate Plaintiff's

---

[18] The doctor's notes from Plaintiff's December 5, 2007 appointment at MCV are difficult to read. Although the notes make mention of his left wrist, it is unclear what course of action, if any, the doctor recommended. (*See* Defs.' Reply Ex. 10, at NNRJ388.)

court appearance, the April 2 appointment was rescheduled for April 16, 2008. (*See id.* at NNRJ369.) Plaintiff underwent surgery for his wrist on May 16, 2008, and he was scheduled for a post-operation follow-up at MCV on May 21, 2008. (*See* Defs.' Mem. L. Ex. 2, at NNRJ364, NNRJ307.) MCV rescheduled the appointment for May 28, 2008, and Plaintiff attended the appointment on that date. (*See id.* at NNRJ307.)

Because Plaintiff ultimately received corrective surgery on his wrist, his wrist-based deliberate indifference claim must therefore be based on delayed treatment. A plaintiff alleging that delayed treatment constitutes deliberate indifference must show that the delay resulted in some substantial harm, which "may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Harris v. Frazier*, No. 3:07CV701, 2009 U.S. Dist. LEXIS 27596, at *21 (E.D. Va. Mar. 30, 2009) (quoting *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005)). "[T]he cases that discuss delay as a basis for a deliberate indifference claim . . . . are just one step short of the clear case of deliberate indifference where an officer simply *refuses* to provide medical attention known to be necessary." *Coppage v. Mann*, 906 F. Supp. 1025, 1041 (4th Cir. 1995) (emphasis in original).

The record contains no indication that Plaintiff's wrist problems persisted after his surgery. To the extent that any delay between Plaintiff's October complaint and his May surgery caused him considerable pain, Nurse Neale cannot be held accountable. It is undisputed that NNRJ's medical staff has to schedule appointments through MCV. (Neale Decl. ¶ 17.) Plaintiff's April 2, 2008 appointment was pushed back to April 16, 2008 to accommodate Plaintiff's court appearance, and MCV cancelled his May 21, 2008

follow-up appointment (which was rescheduled for May 28, 2008). Notably, Plaintiff's chief complaint in his inmate requests was not that he suffered from pain in his wrist, but rather that he needed an MRI.

In sum, Nurse Neale cannot be held accountable for MCV's treatment decisions. Even if she could, Plaintiff's complaint amounts to a mere disagreement over his course of treatment or, at worst, medical malpractice. Neither scenario states a cognizable claim for deliberate indifference. *Miltier*, 896 F.2d at 852 ("[M]ere negligence or malpractice does not violate the eighth amendment."); *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) ("Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged.") Accordingly, Nurse Neale is entitled to qualified immunity, and judgment will be entered in her favor.

## 2. The Non-Medical Defendants

Plaintiff's remaining Eighth Amendment Claims are against Major Hull and Captain Turner, supervisors at NNRJ who were not directly responsible for administering healthcare.

"[S]upervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." *Shaw v. Straud*, 13 F.3d 791, 798 (4th Cir. 1994). In order to establish supervisory liability under Section 1983, the plaintiff must show that (1) "the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff;" (2) the supervisor's response was so

inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) there existed "an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Id.* at 799 (citations omitted); *see also Miltier*, 896 F.2d at 854.

Supervisory liability is not based upon *respondeat superior*, but rather upon "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984) (internal citations omitted); *see also Miltier*, 896 F.2d at 854.

Having found that the medical staff was not deliberately indifferent to Plaintiff's medical needs—and thus that Plaintiff suffered no constitutional injury—it follows that Plaintiff cannot establish supervisory liability as to Captain Turner and Major Hull. Put simply, a supervisory defendant cannot have tacitly authorized or been indifferent to a constitutional violation that never occurred, and thus Plaintiff cannot establish "an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Shaw*, 13 F.3d at 799.

Even if the medical staff had ignored Plaintiff's medical needs, Plaintiff has not established the requisite causal link to Major Hull and Captain Turner. In order to prevail against Major Hull and Captain Turner, Plaintiff would need to prove that they "completely fail[ed] to consider [his] complaints" or "act[ed] intentionally to delay or deny the prisoner access to adequate medical care." *Hick v. James*, 255 F. App'x 744, 749 (4th Cir. 2007). The test is subjective, requiring "a showing that the defendants . . .

18

actually knew of and ignored a detainee's serious need for medical care." *Young v. City of Mount Ranier*, 238 F.3d 567, 575–76 (4th Cir. 2001); *see also Farmer*, 511 U.S. at 837, 114 S. Ct. at 1979. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844, 114 S. Ct. at 1982–83.

In this case, Captain Turner and Major Hull responded reasonably to Plaintiff's requests. Plaintiff first directed a request to Captain Turner on January 17, 2008,[19] complaining that his neck and wrist were bothering him. (Pl.'s Br. Resp. Ex. 2, at XF-000011.) He submitted a similar request to Captain Turner on January 21, 2008. Captain Turner referred the January 17 request (which encompassed Plaintiff's complaints in his January 21 request) to Captain Sudduth on January 24, 2008. (*Id.* at XF-000012.) Captain Sudduth, who had just responded to a nearly identical request made on January 22, 2008,[20] simply responded, "Duplicate." (*Id.*) Plaintiff did not complain to Captain Turner again about his neck or wrist.[21] Captain Turner's response to Plaintiff's

---

[19] Plaintiff's request is dated January 16, 2008, but it was only marked as received by an NNRJ staff member on January 17, 2010.

[20] On January 20, 2008, Fisher submitted a request to Captain Sudduth complaining of pain in his neck and wrist. (Pl.'s Br. Resp. Ex. 2, at XF-000015.) Captain Sudduth responded, "As I just responded Mrs. Neale will speak with Dr. Reese about your medical conditions and get back w/you." (*Id.*) Indeed, Captain Sudduth had responded that same day to a separate request directed to Major Hull. The Captain replied that he had spoken with Nurse Neale, who would speak with Dr. Reese concerning Plaintiff's medical condition. (*See id.* at XF-000017.) Given that prison officials are entitled to rely upon their health care providers' expertise, *see Miltier*, 896 F.2d at 854, Captain Sudduth's response was eminently reasonable.

[21] Plaintiff directed requests to Captain Turner on February 15 and 16 of 2008, complaining that he sprained his ankle. (Pl.'s Br. Resp. Ex. 2, at XF-000033, XF-000034.) He also directed a request to Captain Turner on May 29, 2008, in which he requested security because another

19

requests—passing the request on to Captain Sudduth, the supervisor in charge of the Medical Department—was patently reasonable.

As for Major Hull, Plaintiff first directed a request to him on January 20, 2008, complaining that he was still in need of treatment for his neck and wrist. (*Id.* at XF-000016.) Although Major Hull does not specifically recall the actions he took with respect to Plaintiff's request forms, his standard practice was to pass "any and all medical request forms relating to issues regarding medical care. . . to the Medical Department, through Captain Sudduth and/or Nurse Neale and/or discuss[] with someone from the Medical Department." (Hull Decl. ¶ 11.) The record suggests that Major Hull followed that practice in this case.[22]

---

inmate had threatened him. (*Id.* at XF-000055.) Neither Plaintiff's alleged ankle injury nor his security are at issue in this case.

[22] In response to Plaintiff's January 20, 2008 request to Major Hull, Captain Sudduth stated, "I have spoken w/Mrs. Neale. She will speak w/Dr. Reese regarding your medical condition." (*Id.* at XF-000017.) Plaintiff's next request to Major Hull was dated January 24, 2008. (*See id.* at XF-000019.) On January 30, 2008, Captain Sudduth, who had already responded to a similar request that day, responded, "Duplicate." (*Id.*; *id.* at XF-000023.) The record does not indicate a response from Major Hull to Plaintiff's February 7, 2008 request, but Plaintiff received a detailed response from Captain Sudduth concerning a separate, similar request made the same day. (*See id.* at XF-000029, XF-000031.) Specifically, Captain Sudduth stated her understanding that Plaintiff was seen on January 29, 2008 for his wrist; refused assessments on February 10 and 17 while housed in administrative segregation; and was seen by Nurse Veney on February 18, 2008. (*Id.* at XF-000031.) Additionally, Captain Sudduth stated that "Mrs. Neale will request you be brought to medical today to re-evaluate." (*Id.*) The level of detail in Captain Sudduth's response alone indicates that the NNRJ staff was closely tracking Plaintiff's care.

Next, on March 2, 2008, Plaintiff submitted a request which stated that he had not been back to MCV since his January 28, 2008 MRI. (*Id.* at XF-000041.) Plaintiff was returned to MCV within three days. (*See* Defs.' Reply Ex. 10, at NNRJ329.)

Finally, Plaintiff directed several requests to Major Hull in May 2008 asking whether he had exhausted his administrative remedies, to which Major Hull responded that Plaintiff would need to file an appeal to the Superintendent. (*See* Pl.'s Br. Resp. Ex. 2, at XF-000047.) Plaintiff did not request medical treatment in those requests. (*See id.* at XF-000047, XF-000051.)

Moreover, the record is replete with instances in which Major Hull personally authorized medical treatment for Plaintiff. For example, Major Hull authorized a July 2007 request for follow-up care at MCV; an August 3, 2007 request for an MRI of Plaintiff's chest and neck; an October 2007 request for an x-ray of Plaintiff's hand and wrist, and a CT of his cervical spine; a November 13, 2007 request for an MRI of Plaintiff's left wrist; a March 2008 request for a follow-up appointment in six months at MCV; an April 2008 request for surgery on Plaintiff's wrist; and a September 2008 request for another CT of Plaintiff's spine. (Defs.' Mem. L. Ex. 7.)

In sum, Plaintiff's claims of deliberate indifference are flatly contradicted by the record evidence. Captain Turner and Major Hull are entitled to qualified immunity, and judgment will be entered in their favor.

## B. *Plaintiff's First Amendment Claims*

It is well settled that prison officials may not impinge upon a prisoner's First Amendment rights unless the interference is "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 88–89, 107 S. Ct. 2254, 2261 (1987); *Altizer v. Deeds*, 191 F.3d 540, 549 (4th Cir. 1999). Although the Fourth Circuit has not yet addressed the issue in a published opinion, the overwhelming majority of the circuits agree that prison officials may not retaliate against an inmate for exercising his First Amendment rights. *See, e.g., Rhodes v. Robinson*, 408 F.3d 559, 568 (9th Cir. 2009) (holding plaintiff stated a claim where he alleged prison officials destroyed property, threatened transfer, and assaulted him in retaliation for filing grievance and lawsuit); *Dobbey v. Ill. Dep't of Corrs.*, 574 F.3d 443, 447 (7th Cir. 2009) (reversing district court

dismissal where plaintiff alleged officials retaliated against him for filing grievance after prison guard hung noose in control room); *Bibbs v. Early*, 541 F.3d 267, 272 (5th Cir. 2008) (holding plaintiff stated a claim where prison officials allegedly subjected him to sub-freezing temperatures for more than four hours for four consecutive nights in retaliation for filing grievances); *Boxer X v. Harris*, 437 F.3d 1107, 1112 (11th Cir. 2006) (holding plaintiff stated a claim where plaintiff alleged retaliatory punishment for filing grievance); *Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) (holding plaintiff stated a claim where prison officials allegedly issued false misbehavior reports and sentenced him to three weeks in keeplock in retaliation for using grievance system); *Noble v. Schmitt*, 87 F.3d 157, 162 (6th Cir. 1996) (noting that retaliation in response to filing grievances violates clearly established constitutional law).

> To succeed on a retaliation claim under § 1983, an inmate must allege facts sufficient to demonstrate that the alleged retaliatory act 'was taken in response to the exercise of a [C]onstitutionally protected right or that the act itself violated such a right.' Thereafter, [P]laintiff must demonstrate that he suffered some adverse impact or actual injury. Additionally, an inmate must come forward with specific evidence 'establish[ing] that but for the retaliatory motive, the complained of incident . . . would not have occurred.'

*Miska v. Middle River Reg'l Jail*, No. 7:09cv172, 2009 WL 1916726, at *5 (W.D. Va. July 2, 2009) (internal citations omitted). "[A]n inmate must present more than conclusory allegations of retaliation." *Id.* (citing *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)).

In this case, Plaintiff alleges that Captain Sudduth and Major Hull placed him in Special J in retaliation for communicating with his family and repeatedly requesting medical treatment. (Compl. ¶¶ 9, 59–64.) This claim fails for several reasons.

First, Plaintiff has not established that he was exercising any constitutionally protected right. "[T]he Constitution creates no entitlement to grievance procedures or access to any such procedure voluntarily established by a state." *Adams*, 40 F.3d at 75. In *Adams*, the Fourth Circuit held that an inmate did not exercise a constitutional right by requesting protective custody. *Id.* By analogy, Plaintiff's requests for medical treatment would not constitute protected activity.

The Court need not decide that issue, however, because Plaintiff has not produced any evidence tending to establish that his transfer to Special J was retaliatory. To the contrary, the undisputed facts suggest that he was transferred to medical segregation because of the very ailments Plaintiff stresses in his Eighth Amendment claim. Specifically, Plaintiff arrived at NNRJ with a spinal fracture which required him to be immobilized in an Aspen collar 24 hours per day. (Neale Decl. ¶ 4.) He concedes that he could not defend himself in the general prison population in his medical condition. (Fisher Dep. 109:24.)

A few days after his transfer to NNRJ, Plaintiff collapsed during a court hearing. (Neale Decl. ¶¶ 18–19; Pl.'s Br. Resp. Ex. 3, at NNRJ526.) He complained of pain and burning in his neck and spine, prompting a request for an MRI of his chest and neck. (Pl.'s Br. Resp. Ex. 3, at NNRJ526.) On August 8, 2007—just over one week after Plaintiff's arrival at NNRJ—he was transferred to Special J, the medical segregation unit.

(*See* Hull Dep. 46:15–17, 47:9.) Major Hull has declared under oath that Plaintiff was

housed in Special J because he was taking narcotics, he was required to be immobilized

in an Aspen collar, and he could not defend himself in the general prison population.

(Hull Decl. ¶ 15.) Captain Sudduth has similarly sworn that Plaintiff was housed in

Special J for medical reasons. (Sudduth Decl. ¶¶ 10–11.)

    Plaintiff's only support for his claim of retaliation is his speculative opinion that

he "was moved to Special J as a form of punishment because the medical staff became

exasperated with my complaints about by treatment when I was housed in Medical."[23]

(Fisher Decl. ¶ 19.) Plaintiff's "conclusory allegation[] of retaliation" is insufficient to

survive Defendants' motion for summary judgment.[24] *Miska*, 2009 WL 1916726, at *5

(dismissing retaliation claim pursuant to 28 U.S.C. § 1915(e)(2)(B)).

## V. CONCLUSION

    For the foregoing reasons, Defendants are entitled to qualified immunity, and their

Motion for Summary Judgment will be granted.[25]

---

[23] Plaintiff also points to a Nurse's Note which observed that Plaintiff "became rude and demanding, saying that the nurses were lazy. He is very argumentative and disrespectful." (Pl.'s Br. Resp. 14 (citing Ex. 3, at NNRJ275).) Plaintiff claims that this note "demonstrate[es] their frustration with him." (*Id.*) Notably, however, the note was made after Plaintiff was transferred to Special J, and it was made by a nurse—not Major Hull or Captain Turner. (*See id.* Ex. 3, at NNRJ275.) Moreover, a plaintiff alleging retaliation must do more than claim that officers exhibited "flippant attitudes and comments about his complaints." *Miska* 2009 WL 1916726, at *5.

[24] Additionally, it should be noted that Plaintiff does not know who "punished" him by placing him in Special J, and he cannot say whether Major Hull was responsible for placing him there. (Fisher Dep. 169:4–5, 22–25.)

[25] Because Defendants are entitled to judgment as a matter of law on the ground of qualified immunity, the Court need not address whether Plaintiff's claims are barred for failure to exhaust under the PLRA.

An appropriate Order will accompany this Memorandum Opinion.

/s/

Henry E. Hudson
United States District Judge

Date: March 11, 2011
Richmond, VA